### Lyman D. James v. John Brown and others.

Where a mortgagee, with knowledge of a subsequent mortgage on a part of the premises mortgaged to him, releases a part or the whole of the premises not covered by the subsequent mortgage, and the remaining property is not sufficient to pay both, equity will postpone the payment of the first mortgage out of the proceeds of a sale of the remaining property to the extent of the injury done the subsequent mortgagee by the release.

11 MICH.—C.

But the rule of notice, in such case, is different from the rule equity acts on to protect bona fide purchasers. Where one purchases property which was subject to an equity in the seller's hands, it is enough that he have knowledge of such facts and circumstances indicating the equity as would have led a prudent man to inquire in regard to it, and that he omitted to do so; while in the case of mortgages, the existence of the second mortgage should be clearly brought home to the knowledge of the first mortgagee, in such a way that any act injuriously affecting the interests of the subsequent mortgagee will show an intentional disregard of the interests of such subsequent mortgagee.

*Heard July 11th and 12th. Decided November 18th.*

Appeal from Wayne Circuit in Chancery.

The bill was filed against John Brown and Emma his wife, Uzziel Dunham and Walter C. Skiff, to foreclose a mortgage given January 21, 1855, by Brown and wife to Enoch James, to secure the payment of $13,000 in three payments, at three, four and five years respectively, with interest, for which notes were given. This mortgage was upon lot 39 in section number 7 of the Governor and Judges' plan of the city of Detroit, and was assigned to complainant January 19, 1858. The bill states that, before such assignment, and on January 21, 1857, Enoch James released to John Brown a portion of the mortgaged premises particularly described in the bill. At the time of filing the bill the whole principal, and $1,600 of interest, were claimed to be owing on the mortgage.

Brown and his wife answered, alleging that the mortgage was given to secure the payment of $6,500 money loaned, and $6,500 in satinet cloth, which was to be worth fifty cents per yard, to be thereafter delivered; that the requisite quantity of cloth was afterwards delivered, but of greatly inferior quality and value; and a deduction was claimed from the mortgage of $3,650 by reason of the inferior quality of the cloths.

Skiff answered, that he was assignee of a mortgage of $8,500, given to Brown, August 22, 1855, by Uzziel Durham, on a portion of the premises covered by the James mortgage and not released therefrom, which portion Durham had purchased of Brown at that date; that this mortgage

was duly recorded August 24, 1855, and was assigned by Brown to Skiff, August 27, 1855, to secure the sum of $2,000 Brown was owing him. The answer further states that before James released to Brown any of the premises covered by his mortgage, they were ample security for the two mortgages; that the value of the portion released was $14,000, and of the remaining portion only $13,000, and that by the operation of the release Skiff's security will be entirely destroyed unless the Court shall give him relief against the same — both Brown and Durham being entirely irresponsible. And it avers that James had notice of the Durham mortgage, and of its assignment to Skiff, before executing the release.

Replications having been filed to the answers, and testimony taken, the Court below made a decree in favor of James, allowing him $6,500 for moneys included in the mortgage, but only twenty - seven cents per yard for the satinets; for the payment of which sums decree was made against Brown, but postponing the lien of complainant to that of Skiff on the premises covered by the Durham mortgage, to the extent that the security under that mortgage would be affected by the release to Brown. From this decree James appealed.

*C. I. Walker*, for complainant, argued that the proof did not establish the contract in regard to the satinets set up in Brown's answer; that the record of the conveyance from Brown to Durham, and of the mortgage back, and the assignment of this mortgage to Skiff, was not constructive notice to James: — 1 *Johns. Ch.* 409; 1 *Sandf. Ch.* 405; 2 *Barb. Ch.* 151; 3 *Sandf. Ch.* 192; 5 *Rawle*, 51; 2 *Stock.* 119; that the notice of a subsequent incumbrance, to affect a prior incumbrancer, in the absence of collusion or fraud, or of an intent to injure the subsequent incumbrancer, should be a full and clear notice from the latter, that he has and relies upon such subsequent incum-

brance, and that the prior incumbrancer must do no act to lessen his security. Just this kind of notice is contemplated by the cases above cited, especially by 3 *Sandf. Ch.* 208; 2 *Stock.* 124, and 5 *Rawle,* 51. The burden of proof to show notice is upon Skiff, and it must be clear and distinct, so that James would have been acting in bad faith to disregard it: — 4 *Mich.* 87; 2 *Lead. Cas. in Eq.* 136 *and* 190; 28 *E. L. & Eq.* 84.

*H. M. Cheever,* for defendants Brown.

*Wells & Hunt,* and *G. V. N. Lothrop,* for defendant Skiff, to the point that the holder of a prior mortgage can not release a part of the mortgaged premises, and thus increase the burden upon that part covered by a subsequent mortgage covering less than the whole, cited: — 2 *Barb. Ch.* 151; 6 *Paige,* 35; 1 *Johns. Ch.* 425; 3 *McLean,* 587; 19 *Pick.* 231; 11 *Penn.* 312; 4 *Halst.* 561; 8 *N. Y.* 271. And whatever is sufficient to put the party upon inquiry, is notice of the subsequent mortgage: — 4 *Mich.* 87; 3 *Sandf. Ch.* 192, 208; 2 *Stock.* 119.

MANNING J.:

Complainant, who is also appellant, insists that the decree of the Court below in his favor is erroneous in two particulars:

1st. In not allowing a larger sum to be due him on the mortgage.

2d. In making the decree in his favor subject to Skiff's interest in the Durham mortgage.

The consideration of the mortgage the bill is filed to foreclose, was $6,500 cash, and $6,500 in satinet at fifty cents per yard. The satinet was afterwards delivered, but it was not worth over twenty-five or twenty-seven cents per yard, as appears by the testimony; and the question is whether it was to be received by Brown at fifty cents per yard, or was to be worth fifty cents per yard. * * *

From the evidence before us we must hold that there was a warranty that the satinet should be worth fifty cents a yard. The Circuit Court was right, therefore, in deducting from the amount of the mortgage the difference between the actual value of the satinet per yard and the fifty cents.

2d. Had James notice of the assignment to Skiff when he released a part of the premises covered by his own mortgage? On the answer to this question depends the correctness of that part of the decree postponing complainant's rights to Skiff's interest in the Durham mortgage, so far as the release lessened the security for the payment of what was due Skiff on the latter mortgage.

If A. has a mortgage on two pieces of property, and B. a subsequent mortgage on one of the pieces only, and A. files a bill to foreclose his mortgage, in order to protect B. without injuring A., equity will require A. first to sell the piece not covered by B.'s mortgage, before selling the latter, when it can be done without prejudice to the recovery of A.'s debt, but not otherwise. Acting on this principle, if A., with a knowledge of B.'s mortgage, releases a part or the whole of the lot not covered by B.'s mortgage, and the remaining property is not sufficient to pay both A. and B., the Court will postpone the payment of A.'s debt to the payment of B.'s out of the proceeds of a sale of the remaining property to the extent of the injury done B. by the release.

.The principle the Court acts on in this class of cases s different from the principle it acts on to protect bona fide purchasers. In purchasing property the buyer must look to the title of the seller. If the seller have no title the buyer acquires none. If he have the legal title and there be an equity affecting it in his hands, the purchaser may or he may not take the property subject to the equity. Actual knowledge of the equity is not necessary to charge him with it. It is enough that he had a knowledge of such facts and circumstances, indicating an equity in another,

as would have led a prudent man to inquire in regard to it, and that he omitted to do so.

The question before us does not involve the duties of a purchaser, but one's duty in dealing with his own property.

The law requires every man so to deal with his own as not unnecessarily to injure another. He may sell his property to whom he pleases, without consulting his neighbor, or inquiring how it may affect his interests. And if he take a mortgage of A. to-day, he may to-morrow, or next week release a part or the whole of the mortgaged premises on the request of the mortgagor, without troubling himself to inquire whether in the mean time some one has not taken a subsequent mortgage, and if so, whether it would be agreeable to such person that he should release. It is the duty of a subsequent mortgagee, if he intends to claim any rights through the first mortgage, or that may affect the rights of the mortgagee under it, to give the holder thereof notice of his mortgage, that the first mortgagee may act with his own understandingly. If he does not, and the first mortgagee does with his mortgage what it was lawful for him to do before the second mortgage was given, without knowledge of its existence, the injury is the result of the second mortgagee's negligence in not giving notice. While the law requires every man to deal with his own so as not to injure another, it imposes a greater obligation on the other to take care of his own property than on a stranger to take care of it for him. And to make it the duty of the first mortgagee to inquire before he acts, lest he may injure some one, would reverse this rule, and make it his duty to do for the second mortgagee what the latter should do for himself. To affect the conscience, therefore, of the first mortgagee—for this whole doctrine is one of equity jurisprudence and not of positive law—it would seem that he should have actual knowledge of the second mortgage.

We do not say notice from the second mortgagee is absolutely necessary to enable him to claim the rights of which we have been speaking; but we do think that the existence of the second mortgage should clearly be brought home to the knowledge of the first mortgagee, in such a way as to show an intentional disregard by him of the interests of the subsequent mortgagee.

We do not think this is done in the present case.

The Durham mortgage was one given by Durham to Brown, who could claim no property under it by reason of the release he had procured from James. James may, and we think did, know of the Durham mortgage; but did he know of its assignment to Skiff?

Brown's testimony is the only evidence bearing directly on this question. It becomes necessary therefore to examine it closely. He no where states in his testimony that he ever informed James that he had assigned the Durham mortgage to Skiff. It may be inferred, but it is not stated in clear and unequivocal language.

He says "some two or three months prior to the date of the release, I had a conversation with Enoch James in relation to what was called the Skiff mortgage, that is, the mortgage given by Durham to me, and by me assigned to Skiff." The conversation according to this statement was relative to the Durham mortgage, and not to the assignment of it. By whom the Durham mortgage was commonly called the Skiff mortgage he does not say. But after saying the conversation related to the Skiff mortgage, he goes on to state what he means by the Skiff mortgage; that it was a mortgage given by Durham to him, and by him assigned to Skiff. It is in this roundabout way that Skiff and the assignment are mentioned. If the conversation related to the assignment by him of the Durham mortgage to Skiff, he should have said so, but he does not. A little further on in his testimony he says: "During the conversation, Mr. James mentioned the Skiff mortgage,

and contended he would have that mortgage to pay or take care of. I told him no; and I contended that he had a right to execute the release." Here the Skiff mortgage is used again by the witness, and we must suppose in the sense in which it is first used by him, when he says he means by it the Durham mortgage. It is used a third time by him in speaking of what occurred at Maynard's office. He says it was there mentioned that the Skiff mortgage was for $2,000, or thereabouts. The Durham mortgage was for $5,500, and it was assigned to Skiff for $2,000. It would therefore seem that in this instance he must have meant by the Skiff mortgage the assignment to Skiff and not the Durham mortgage. But this inference is too slight to charge James with a knowledge of the assignment to Skiff.

Miller, defendant's witness, heard a conversation between Brown and James before they went to Maynard's office, and went with them there; but there is not one word in his testimony about Skiff, the Skiff mortgage, or the $2,000. He speaks of the Durham mortgage, but not one word of any assignment. It is a little singular if the assignment of the Durham mortgage to Skiff was what stood in the way of the release, that Miller, who was then negotiating to loan money to Brown on the property to be released, should make no mention of Skiff, the Skiff mortgage, or an assignment.

We have been thus particular in scanning Brown's testimony, as the defense may be said to turn on the view taken of it. In our opinion it does not bring home to James a knowledge of the assignment of the Durham mortgage to Skiff.

There is other testimony of a circumstantial nature, which it is not necessary to notice, as it is consistent with a different theory from that maintained by the defense; and with the view we have taken of Brown's testimony is of no importance.

JAMES *v.* BROWN.

The decree, so far as it postpones what is due complainant to the rights of Skiff under the assignment of the Durham mortgage, is erroneous, and must be so modified as to give a priority of payment to complainant, with costs in this Court.

MARTIN CH. J. and CHRISTIANCY J. concurred.

CAMPBELL J. concurred except as to the price of the satinet, in regard to which he held the defense not to be sustained by the evidence.